So we will hear CDK Global v. Tulley, 25-1739 and 25-1910. Good afternoon, Your Honor. Good afternoon. Carmine Castellano for Defendant Appellant Tulley Automotive, respectfully requesting six minutes for rebuttal. Sure. Your Honor, we are appealing a very simple issue, whether Tulley proved that CDK violated the New Jersey Consumer Fraud Act at trial. The district court erred in concluding as a matter of law that Tulley failed to do so. As Your Honors are well aware, such a claim carries three separate elements. One would be unlawful conduct. Two would be ascertainable loss. And three would be causation. With respect to unlawful conduct, we showed three separate categories of affirmative misrepresentations. What were they specifically? Because the court seemed to really lean on the fact that this was puffery, right? Yes, that's correct, Your Honor. Well, let's just for the record point out that in the initial trial decision, the trial court judge relied on language from the summary judgment decision in – which eliminated certain misrepresentations, which we agree were puffery, such that the new system would make them more – help them make more money or things like that. But the three categories that were – three categories of misrepresentations that were tried were factual, they were reasonably specific, and they were material to the transaction. They were very important to Tulley. One was that the customer information from the existing system would transfer over easily and accurately to the new system. That is – that information is critical. It's lifeblood to the business. That did not happen. There was overwhelming evidence at trial in the form of long-term employees at Tulley who testified that the information was missing or it was wrong. A customer allegedly owned 20 BMWs when in reality it had two or somebody's service history was just missing. That representation is specific enough to withstand a puffery scrutiny, and it was proven at trial to be false. That's one misrepresentation. How does that misrepresentation overcome the puffery scrutiny? Can't – couldn't they just argue and they did? They may have just – they may have argued. It just didn't work well enough, but our system was able to transfer the customer info. There were mistakes. There were mistakes in inputting. There had to be some inputting done in addition to the software that was supplied. Well, my understanding, Your Honor, is that the statement was that it would come over completely and accurately, and that was not the case. It wasn't just one-offs. The customer service history did not come over, meaning – At all? At all. to the paper files to pull that information. As in anything, time is money. So instead of just pulling it up on your computer, you have to go digging in the paper files into the archives to figure out what this car has had done in the past, which takes a lot more time than if you can just pull it up in the computer as the salesperson represented it would. That's one misrepresentation. A second misrepresentation was that the payroll system would – the payroll component of the system would be able to handle Tully's payroll. Former employee Dave Peterson gave deposition testimony that that was completely not the case. He testified that the system was deficient in many ways. It was unable to have Tully comply with state requirements for workers' comp. And this employee from CDK told Tully to go back to its old payroll system. Again, another very important component here is the payroll, which again was falsely represented to Tully in the sale of the product. Another misrepresentation was that the new system would be able to handle Tully's multi-franchise dealership, that the system would be able to handle all of their business needs. As the trial court found correctly, that was not the case. CDK internally acknowledged that the system sold to Tully could not handle their business needs. In fact, the primary cause of Tully's issues were the fact that they did not have multiple log-ons when this product was purchased from CDK. In fact, CDK made a recommendation to Tully to reinstall the entire system with these additional log-ons. That's an admission that the system as sold to Tully out of the gate was insufficient to meet the needs of its multi-franchise dealership. Again, and just to break that down, at Tully's Nashua location, it sold BMWs, Mazdas, and GMs. Tully has an auto mall in its Nashua location. What that means is that it's one building, but within that building, there are three separate departments. There's a BMW department, there's a GM department, and a Mazda department, similar to a mall. If you go to a mall, you can go to Gap, and then you can go to Foot Locker. It's all in the same building. What CDK sold to Tully was one single log-on for the computer system for all three franchises. Meaning, when the GM employee logged into the system, that person saw all information and everything relating to BMW, relating to GM, relating to Mazda. What Tully needed were three separate log-ons so that when the BMW employee logged in, the BMW employee only saw the BMW service and financing options and the inventory. That wasn't the case. Again, that was another misrepresentation that was proven at trial. Again, those three categories of misrepresentations form the basis for the unlawful conduct element of the consumer fraud claim. With respect to ascertainable damages, we raised the issue of the contract payments, which the trial court never addressed, even in the motion to amend the judgment. Assuming Tully was defrauded into signing the master services agreement, the contract payments that were made over a year and a quarter could qualify as the ascertainable loss. Lastly, your honors, if we prove unlawful conduct, we can get attorney's fees under the statute, even if you cannot show an ascertainable loss. That's Cox, Weinberg, and Perez in the New Jersey Supreme Court. The reason is that the damage element of the statutory fraud claim survived summary judgment before Judge McNulty and went to trial. So it passed. It was a bona fide claim that went to trial. If your honors have no other questions for me, I'll save for rebuttal. Thank you. Thank you. Good morning, Erwin Strum on behalf of CDK Global. May it please the court. As to the actual findings that the trial court made, they're only challenging right now three of these alleged misrepresentations. And the first I'll start with the accurate accurately and easily argument. Actually, we step back and talk about ascertainable loss because ascertainable loss was not clearly erroneous. It was not clearly erroneous because the only evidence they put on or they were going to put on was actually blocked because their expert was barred by a Daubert decision. And they did not appeal that. So to prove ascertainable loss, what they needed to show is that under their theory that the payments that they made for the contract, they didn't get their money's worth that they received a subpar version of the system. But their expert was going to talk about damages and why the subpar system was worth a certain amount less. That person never testified. I get that. But why don't you walk us through the three misrepresentations and tell us why counsel's wrong. Yes, your honor. So as to the whether or not they could handle the information from our Kona, whether transfer accurately and easily, I think the accurately and easily language is something that is not concrete and measurable. So it's not something that's falsifiable. And that's why it falls in the category of puffery. This is something where, in fact, there was evidence that it did transfer over. They signed to verification checklists. And those checklists are at the response appendix page to 11 and a page to 13. One was signed by Tully's general manager. It was signed by their parts when their parts managers and then also Mark Tully testified on the stand. I know that it transferred talking about the data. That's a response appendix page 41. So the only question would be, there's no standard to measure or not, whether accurately or easily was violated in some way when they admit that it all did transfer. As to the question about payroll system, there was evidence in the record that said it did work. That's an R. A. 133. And again, their statement here is whether it could handle the multi-franchise dealerships and whether it could handle payroll. And it did. They were able to operate. The trial court found in rejecting their breach of contract argument that we actually did provide the services that they were capable of providing the services. And so in that circumstance, I think the record does not show that it's clearly erroneous to treat this as puffery. Again, it's not concrete measurable. There's nothing you can say. I can't say it didn't handle payroll at all. And the multi-franchise dealership, their own witnesses talk about taking longer, not about not working at all. Unless there are other questions. What are the multi-franchise dealership piece? On the multi-franchise piece, their service manager said you could get a result that just took longer. Their parts manager said the same thing. There were delays, which were probably because of training issues he admitted. Those are pages R.A. 82 and R.A. 83 of the record. And there was testimony as well from a CDK witness that it could operate. So on all those issues, the question whether it could handle it or not, it did handle it. If it was a little bit slower, that's not a concrete and measurable thing that could be falsifiable. Again, these are statements we're talking about that Jeff Evans made back when he was describing what the system would do in the future. And he didn't say it in such a way that it was concrete and falsifiable. As to the cross appeal, the trial court made two legal errors. The first legal error was that it did not recognize that the termination notice was a breach of the contract. The termination notice expressly provided that this letter, and this is on page R.A. 247, this letter is a notice of rescission of the master agreement. And it says it's a termination of the master agreement. And it says, quote, my client will not be paying any further contract fees. So at that moment, on September 10th, 2014, that was a breach. And for the trial court to fail to recognize that is a legal error. And then the next step is the party presentation principle, where they didn't present any legal arguments. If you look at their trial brief, there are no arguments about what the law was that the trial court should be applying, which is why the trial court had to reach out and turn to the UCC, which, again, they're not disputing that the UCC does not apply. In their cross appellee brief, they didn't dispute that the UCC didn't apply. They didn't argue that they made that argument. So the only law that the trial court applied, nobody thinks it was right. And the trial court didn't cite any proper standard of law. And that's because they didn't make that argument. The Supreme Court last year said judges are supposed to call balls and strike, not take a turn at the bat. And kind of by pulling the UCC, and that was taking a turn at the bat, it was advancing a legal argument. And they didn't advance any law that would support their theory that there was some excuse or justification that changed that breach into something that was no longer binding. Again, they didn't address that in their appellee brief. But doesn't the statute in question actually also contain a retraction of anticipatory repudiation? Isn't that what the district court found here, that there was anticipatory repudiation that they retracted? Well, that's – if the court did find that, that statute doesn't apply. And they're not arguing the statute applies? No, they're not arguing the statute applies. But at 12A.2A.403, there's another statute. Well, yes, Your Honor. And this puts me in the same situation of showing why I think the party presentation principle matters. They've never briefed that statute. I haven't heard about that statute, that section of it. I mean, I probably have a copy because I printed the whole thing out. But it's not something that's been argued. And when they don't present an argument in the trial court, they have forfeited that argument. And that means that on appeal – in fact, this court held last year in a case called Valley that an appellee, you know, is limited by the arguments that are actually in the record. They can't argue for affirmance on other grounds for arguments that weren't made below. It's not part of the record. So I think to the extent that I'm – the only law that the district court mentioned at any point is this UCC provision that nobody argues correctly applies and doesn't apply. This is not a – primarily a sale of goods. They used the wrong statute, but they asserted the right doctrine. Well, I'm not sure what the right doctrine is, Your Honor, because it was never asserted. That's the part – the difficulty of the situation I'm in because there are possible legal theories that they might have advanced. If they had advanced those, we would probably have responses to them. But the fact that they didn't raise the argument in the first place puts us in the awkward position of not being able to respond because they haven't briefed it. So I think those two legal errors are why we should prevail on the cross appeal, that the district court is wrong about the anticipatory breach because that language is plainly an anticipatory breach and because there was no argument in their briefing below. But again, their trial brief, for example, at pages 38 and 39 where they talked about this issue doesn't cite any cases or any law. And their appellate brief at pages 39 to 50 doesn't cite any law on this issue. Unless the court has further questions. Thank you. Thank you, Your Honor. Thank you. Your Honors, a couple points. Council raises the issue of the checklists, the two checklists that after the system went live, Tully signed two documents that said we got all the information. Those checklists were signed within days, maybe a week or so of the system going live. It was impossible for Tully to check every single data point on its customer database to see that it came over. Those forms are not correct, and they were signed literally within days of the system going live. There is sworn testimony from the employees stating that the customer service history did not come over. That's in appellants appendix 134 through 137. Also at 131 through 132. And a separate employee testified that the customer service history did not come over at appellants appendix 149 to 153. The other issue, Your Honor, that council pointed out was that a single employee said the system worked or it turned on. The court concluded that the system was not sufficient for Tully's business needs. That's at appellants appendix 5, which is page 5 of the decision, where the district court pointed out that CDK internally concluded that the primary cause of Tully's DMS issues was that Tully only had one set of log-ons for the Nashua dealership and not a separate set of log-ons for each franchise at that location and identified this as a sales issue. Going to the cross appeal, so in September of 2014, probably out of frustration, Tully did send a notice that said we are terminating this contract, but we have to look at what happened after that notice was sent. Tully made every single contract payment to CDK up and through the time that CDK sued Tully. Let's not forget that CDK is the plaintiff. Tully made a contract payment after CDK sued Tully and accused him of terminating this contract. Also in April of 2015, after the September 14 letter was sent, Tully's attorney told CDK that we have continued to make payment under the contract and we have not terminated it. That's at Supplemental Appendix 251. After Tully went back and resumed utilizing its former provider at Arcona, CDK demanded a termination notice. They didn't rely on the September notice. They wanted a new one. After CDK sued Tully, CDK demanded a termination notice from Tully. That's in the record at Supplemental Appendix 256 and Supplemental Appendix 264. After CDK sued Tully for allegedly terminating this contract, CDK demanded formal termination notices from Tully because they never received one and they weren't relying on the one that was sent months earlier in September of 2014. One final point, your honor. CDK did not bring one witness to trial who testified that Tully actually terminated the contract. They brought in three witnesses who testified about performance, but not one single witness came to trial on CDK's behalf and said Tully terminated the contract. Unless your honor has any questions for me, that's all I have. Thank you. Thank you. Thank you, counsel, for your briefs and your argument. We will take this matter under advisement and get back to you soon.